STATE OF NORTH CAROLINA v. STEVEN VAN McHONE

No. 148A91

(Filed 8 October 1993)

**1. Evidence and Witnesses § 959 (NCI4th)— first-degree murder— statements of victim—hearsay—state of mind exception**

The trial court did not err in a first-degree murder prosecution by admitting statements by one of the victims regarding threats made by defendant to kill her where the conversations between the victim and the three witnesses related directly to the victim's fear of defendant and were admissible to show the victim's then existing state of mind at the time she made the statements. N.C.G.S. § 8C-1, Rule 803(3) does not refer to the victim's state of mind at the time of death, but to the victim's state of mind at the time the statements were made. Although defendant contended the statements' prejudicial effect far outweighed any probative value since several of the statements were made long before the date of the murders and the most recent discussion about defendant's threats occurred six months before the murders, the evidence tended to show a stormy relationship over a period of years leading up to the murders, and the fact that the last incident testified to occurred six months prior to the murders does not deprive the evidence of its probative value. Finally, considering the eyewitness testimony, it does not appear that the statements in question had any undue tendency to suggest a decision on an improper basis.

**Am Jur 2d, Federal Rules of Evidence §§ 228, 230, 231.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declarant's mental, emotional, or physical condition. 75 ALR Fed. 170.**

**2. Criminal Law § 868 (NCI4th)— first-degree murder—voluntary intoxication—instruction not included with other repeated instructions—no error**

The trial court did not err in a first-degree murder prosecution by not reinstructing the jury on voluntary intoxication when the jury asked the court to review the instructions on first-degree murder in the deaths of the two victims. The request by the jury to be reinstructed on certain elements

of the law of murder as it pertained to the victims was specific and the court reinstructed accordingly. Moreover, defense counsel did not object when the court asked trial counsel if there were any requests for corrections to the instructions after reinstructing the jury.

**Am Jur 2d, Trial § 1109.**

3. **Criminal Law § 468 (NCI4th)— first-degree murder— prosecutor's closing argument—no gross impropriety**

The arguments of the prosecutors in a first-degree murder prosecution were not so grossly improper as to constitute a denial of defendant's due process rights where defendant contended that the prosecutors employed a barrage of impermissible ploys, including references to the defendant as "one-eyed Jack," arguing facts not in evidence, irrelevant law, misstatements of the law, improper biblical references, and misstatements of expert testimony, but defendant did not object at trial.

**Am Jur 2d, Trial §§ 401, 406, 412, 499.**

4. **Criminal Law § 1355 (NCI4th)— first-degree murder— sentencing—no significant history of criminal activity—not submitted—no error**

The trial court did not err in a first-degree murder prosecution by not submitting the statutory mitigating circumstance of no significant history of prior criminal activity where the evidence before the trial court at the sentencing hearing shows that, prior to murdering his mother and stepfather, and shooting his half-brother, this twenty-year-old defendant had prior convictions for: a provisional license violation, failure to stop at the scene of an accident, possession of an alcoholic beverage by a person under twenty-one years of age, being drunk and disruptive in public, fourteen counts of felonious breaking and entering, thirteen counts of felonious larceny, and one count of conspiracy to break and enter. In addition, defendant's psychiatrist, an expert witness, testified that defendant told him that he was convicted at age seventeen for stealing a woman's pocketbook to get drugs and that he had also broken into approximately sixty houses to support his drug problem. No rational juror could have found that defendant had

no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1) (1988).

**Am Jur 2d, Criminal Law §§ 598 et seq.**

5. **Constitutional Law § 314 (NCI4th)— first-degree murder — sentencing—defense counsel's argument—did not consent to death penalty**

Defense counsel's arguments in a first-degree murder sentencing hearing were not constitutionally deficient where defendant contended that he was entitled to an evidentiary hearing on his knowing consent to his counsel's admission of guilt and sanctioning of the death penalty, but defense counsel's argument, when read in its entirety, neither endorsed nor sanctioned the death penalty. Defendant had already been convicted of the two first-degree murders and defense counsel made every effort during closing arguments to convince the jury not to recommend a sentence of death.

**Am Jur 2d, Criminal Law §§ 752, 985.**

**Modern status of rules and standards in state courts as to adequacy of defense counsel's representation of criminal client. 2 ALR4th 27.**

6. **Homicide § 476 (NCI4th) — first-degree murder — instructions — transferred intent — no error**

The trial court's instruction regarding transferred intent in a first-degree murder prosecution did not erroneously rely upon an unconstitutional, conclusive presumption. This contention was recently addressed and rejected in *State v. Locklear*, 331 N.C. 239.

**Am Jur 2d, Homicide § 500.**

7. **Constitutional Law § 371 (NCI4th)— death penalty — constitutional**

The North Carolina death penalty statute is constitutional.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

STATE v. McHONE

[334 N.C. 627 (1993)]

**8. Criminal Law § 1373 (NCI4th) — death penalty — not disproportionate**

The evidence in a sentencing hearing for two first-degree murders clearly supported the jury's finding of aggravating circumstances, there is nothing in the record that suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and it could not be held as a matter of law that the sentence of death was disproportionate or excessive after comparing this case, where defendant killed his defenseless mother by shooting her in the back of the head and also shot and killed his stepfather, to similar cases in the pool.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

Justice PARKER did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Long, J., at the 25 February 1991 Criminal Session of Superior Court, Surry County. Defendant's motion to bypass the Court of Appeals as to an additional judgment allowed by the Supreme Court 13 May 1992. Heard in the Supreme Court 2 November 1992.

*Michael F. Easley, Attorney General, by Tiare B. Smiley, Special Deputy Attorney General, for the State.*

*Heidi G. Chapman for defendant-appellant.*

FRYE, Justice.

On 4 June 1990 a Surry County grand jury indicted defendant for the murder of Mildred Johnson Adams and Wesley Dalton Adams, Sr. Defendant was also indicted on 20 July 1990 for assault with a deadly weapon with intent to kill inflicting serious injury on Wesley Dalton Adams, Jr. In a capital trial, the jury returned verdicts finding defendant guilty of the first-degree murder of Mildred Johnson Adams (Mrs. Adams or defendant's mother) and Wesley Dalton Adams, Sr. (Mr. Adams or defendant's stepfather).

The jury also found defendant guilty of assault with a deadly weapon with intent to kill Wesley Dalton Adams, Jr. (Wesley Jr. or defendant's half-brother). After a sentencing proceeding held pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court imposed sentences of death for each of the first-degree murder convictions. On the same date, the trial court imposed a sentence of ten years imprisonment for the conviction of assault with a deadly weapon with intent to kill. Defendant gave oral notice of appeal on 7 March 1991. An order staying execution was entered by this Court on 25 March 1991.

Defendant brings forward seven assignments of error. After reviewing the record, transcript, briefs, and oral arguments of counsel, we conclude that the guilt and sentencing phases of defendant's trial were free from prejudicial error, and that the sentence of death is not disproportionate.

The State presented evidence tending to show the following facts and circumstances. Wesley Jr., a Captain in the United States Air Force, and his family were visiting in his parents' home in Surry County. At trial, the first witness called by the State was Wendy Adams, Wesley Jr.'s wife and the mother of two-year-old Alex. Wendy Adams (Wendy) testified that on the evening of 2 June 1990, she, Wesley Jr., Alex, and Mr. and Mrs. Adams went on a fishing trip. Wendy and Wesley Jr. cleaned Mr. Adams' camper prior to leaving for the trip. While cleaning the camper they discovered a handgun. Mrs. Adams explained that the gun was for protection from animals when camping.

The family returned from the fishing trip at approximately 12:30 a.m. on 3 June 1990. Defendant, who resided with his parents, was at home when they arrived. Wendy began getting Alex prepared for bed, and while doing so, she overheard defendant arguing with Mr. and Mrs. Adams about money. Defendant told them "he wanted his money and he couldn't go on living like that." Wendy, Wesley Jr., and Alex went to bed. Approximately ten or fifteen minutes after they were in bed, Mrs. Adams opened the door to their room. She asked Wesley Jr. if he had taken the handgun from the camper. Wesley Jr. said that he had not moved the gun. Mrs. Adams responded, "[t]hen its missing" and she closed the bedroom door. Wesley Jr. got up and began to get dressed so that he could find out why defendant was arguing with his parents. However, before he left the bedroom, he and Wendy heard three gunshots.

Wesley Jr. told Wendy "to stay down and keep Alex covered." He then went out into the hallway to find out what had happened. Wendy heard someone coming up the basement stairs, then heard Mr. Adams tell Wesley Jr. to call 911.

Wesley Jr. testified that while he was talking on the telephone with the 911 operator, he turned and saw defendant and Mr. Adams enter the back door. They were wrestling and defendant had a pistol. Wesley Jr. immediately dropped the telephone and disarmed the defendant. Wesley Jr. went back to the telephone and defendant and Mr. Adams began wrestling again. Mr. Adams and defendant struggled out of the living room and headed down the hallway, out of Wesley Jr.'s sight. Approximately a minute later, Mr. Adams reappeared in the kitchen doorway and said, "Your mother is facedown out back. You have got to get help for her. Your mother's facedown. I don't know how badly she's hurt." As Mr. Adams approached Wesley Jr., defendant came to the doorway carrying a shotgun. When Mr. Adams realized that defendant was bringing the gun up into a firing position, aimed at Wesley Jr., he immediately moved toward defendant, reaching for the gun. Defendant fired the shotgun into Mr. Adams' chest, and the force of the discharge threw Mr. Adams into Wesley Jr.'s arms, knocking them both to the floor. Wesley Jr.'s leg was injured. After shooting Mr. Adams, defendant raised the gun in the direction of Wesley Jr. who managed to get up from the floor and take the weapon from defendant. When the struggle ended, Wesley Jr. told defendant to stay down and not to move. Defendant began crying and saying, "Oh, my God. What have I done." Wesley Jr. turned away from defendant to see if his wife was safe. Defendant then stopped crying and reached for the shotgun. Wesley Jr. struggled with defendant again, and was able to keep the weapon from him. Defendant suddenly began to curse Wesley Jr. and told him, "I killed him. Now I want you to kill me, because I don't want to spend the rest of my life in jail. Just shoot me. Just get it over with." Defendant continued to curse Wesley Jr. in a very loud voice and stated that Wesley Jr. was gutless and "if [Wesley Jr.] didn't kill him and he got out of jail he'd hunt [Wesley Jr.] down and hunt his family down and finish [them] off."

William Kent Hall, a member of the first response team organized by the volunteer fire service, testified that when he arrived at the Adams residence Mr. Adams was lying on the kitchen floor. Hall determined that Mr. Adams had a large chest wound and

he did not have a pulse. Tommy Wayne Baker, also a member of the first response team, found Mrs. Adams on the ground in the backyard. She appeared to have been shot in the back of the head, but she was still alive. Mrs. Adams later died from the gunshot wound.

Officer Jimmy Inman, a Deputy Sheriff with the Surry County Sheriff's Department, arrived at the crime scene shortly after 2:00 a.m. When Officer Inman entered the house, defendant yelled, "Why did I do it? What have I done?" Defendant was taken outside and placed in the patrol car. Officer Inman smelled alcohol on defendant's breath. At trial, Officer Inman testified that a person is drunk when that "person's mental and physical capabilities are impaired to the point that he cannot walk, talk, or act in a proper fashion." In his opinion, defendant was not drunk on the night the murders occurred.

Officer Terry Miller, a detective with the Surry County Sheriff's Department, testified that when he entered the couple's residence, defendant stated, "I know what I've done, and I'll have to pay for it. Why don't you just shoot me and get it over with." Miller also testified that although defendant had been drinking, he did not believe that defendant was drunk.

Dr. Patrick Eugene Lantz, a pathologist at North Carolina Baptist Hospital, performed autopsies on Mr. Adams and Mrs. Adams. Dr. Lantz determined that Mr. Adams died of a shotgun wound to the chest, and Mrs. Adams died of a gunshot wound to the head.

The State presented other witnesses who testified to a stormy relationship between defendant and his mother, including several threats by defendant to harm or kill her.

Defendant did not testify. However, defendant presented witnesses whose testimony tended to show the following facts and circumstances. Jimmy McMillian, a social acquaintance of defendant, testified that on 2 June 1990 he, Tammy Sawyers, and defendant drove to Mount Airy and purchased a pint of Jack Daniel's. The group then traveled to a Pizza Hut in Winston-Salem. By the time they arrived at the Pizza Hut, McMillian and defendant had finished a pint and a half of Jack Daniel's. McMillian testified that only he and defendant were drinking and they split the alcohol evenly. While at Pizza Hut, defendant drank a pitcher of beer,

which is the equivalent of five six-ounce beers. In McMillian's opinion, defendant's mental and physical faculties were appreciably impaired because he was staggering and had a "slushy mouth."

Tammy Bryant testified that she had known defendant for a year. They met at a narcotics anonymous meeting. Two weeks before defendant's mother and stepfather were killed, Bryant began seeing defendant romantically. Bryant testified that she saw defendant on 2 June 1990 at Ronald Speaks' house in Mount Airy. According to Bryant, when defendant arrived at Speaks' house he was drunk, his speech was slurred, and he was staggering. Defendant got into a fight with Johnny Swaim because Bryant was with Swaim. Once the fight ended, defendant consumed more alcohol, then walked away from Speaks' house. Defendant later returned to Speaks' house and began to cry when Bryant refused to leave with him. Bryant testified that defendant began "swinging [a] gun around in everyone's face, threatening everybody, moving real swiftly and quickly." Bryant also testified that when she asked defendant several times "what he was on," he responded, "I have taken a couple hits of acid." Approximately thirty minutes later, Bryant, Sawyers, and defendant left the house and went for a ride in Sawyers' car. During the ride, defendant gave his gun to Bryant. Bryant unloaded the gun and then gave it back to defendant. Sawyers drove Bryant back to Speaks' house. Defendant left with Sawyers. Bryant did not see him anymore that evening.

On rebuttal, the State called Sawyers who testified that she did not drink any alcohol on the night in question. She testified that she and defendant had a conversation while driving to Speaks' house and defendant's speech was fine. She also testified that defendant walked fine to and from her vehicle. Sawyers stated that she was never out of defendant's presence for more than five minutes from about 3:00 p.m. on 2 June until nearly 2:00 a.m. the next morning, and she never saw defendant take any controlled substances.

The State did not present any additional evidence during defendant's sentencing proceeding. However, defendant presented the testimony of several witnesses. Dr. James Groce, a psychiatrist, testified that in response to questioning defendant told him about his long history of drug and alcohol abuse. Based on his interview with defendant, Dr. Groce made two psychiatric diagnoses: poly-

substance dependence and adjustment disorder with depressed mood. Dr. Groce defined polysubstance dependence as:

> Dependence on a substance, drugs or alcohol . . . that is a patterned behavior that is compulsive use. That means that an individual could not, without either physical or emotional discomfort, stop the use of that substance. And by polysubstance I mean that this was not limited to one particular chemical, but was a series of chemicals, essentially depending upon availability . . . addictive substances, a series of those. And in his case, it was primarily the alcohol, marijuana and cocaine.

Dr. John Frank Warren, III, a psychologist, testified that he was appointed by the court to evaluate defendant. In his opinion, defendant had a "very serious substance abuse problem" dating from age twelve.

Bobby McHone, defendant's biological father, testified that during defendant's early years, "I stayed drunk. I gambled. I did everything wrong." Mr. McHone also testified that he did not give defendant's mother any peace. Mr. McHone and his wife divorced after ten years of marriage and they shared custody of defendant. Mr. McHone testified that he would leave defendant at home alone while he worked or went out to drink or gamble. He caught defendant drinking at age thirteen or fourteen, and he realized that defendant was taking drugs at age fifteen.

Kathleen Carroll testified that she is a former neighbor of defendant. Defendant helped her run errands and mow the yard at various times. After the defendant's family moved, defendant continued to visit occasionally.

Additional evidence will be discussed as it becomes relevant to a fuller understanding of the specific issues raised on appeal.

## I.

[1] In defendant's first assignment of error, he contends that he is entitled to a new trial "based on the admission of highly prejudicial statements made by the victim Mildred Adams." During the guilt-innocence phase of the trial, the prosecutor offered the testimony of three witnesses, Lydia Adams Logan, Cheryl Adams McMillian, and Nelda Adams concerning statements allegedly made by Mrs. Adams to them regarding threats made by defendant to kill her. After a voir dire examination of the three witnesses, the

trial court admitted the statements under Rules 803 and 804 as exceptions to the hearsay rule. N.C.G.S. § 8C-1, Rules 803, 804 (1992). Defendant contends that these statements were inadmissible under Rule 803(3) because they were not statements of the victim's state of mind as of the date of her death.

Rule 803 of the North Carolina Rules of Evidence provides in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
>     . . . .
>
> (3) Then Existing Mental, Emotional, or Physical Condition.— A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)
>
>     . . . .

N.C.G.S. § 8C-1, Rule 803(3) (1992).

Cheryl Adams McMillian, defendant's half-sister, testified that the first time her mother related her fear of defendant occurred one day while McMillian was at work. Mrs. Adams called her and said, "You've got to come. He's going to kill me." McMillian told her mother to calm down and tell her who she was talking about. Mrs. Adams responded, "Stevie. He's got a knife." McMillian testified that when she arrived at home shortly after her telephone conversation with her mother she was told that defendant had chased her mother around the dining room table and into the kitchen with a knife. McMillian also testified that the last time her mother expressed fear of defendant was when she told her, "I am afraid of him. I am afraid to be alone with him. When Wes is not around, I have to watch what I say to keep him from getting so upset. He has told me that he is going to kill me."

Lydia Logan testified that Mrs. Adams had spoken to her on several occasions regarding defendant's threats. On one occasion, Mrs. Adams told her "they were afraid to lay down and go to sleep at night, afraid he might come in and kill them while they slept. Sooner or later he's going to kill me."

Nelda Adams testified that Mrs. Adams had spoken with her on two occasions regarding defendant's threats. On one occasion, Mrs. Adams told her "that she was afraid for them to go to sleep

of [sic] a night and get in a relaxed state; that they would fall into a deep sleep, because that [sic] she didn't know what they would do if he came in the room and they were not expecting it and had no defense." On another occasion, Mrs. Adams told her that defendant "had threatened to kill them, and that she was afraid that he would follow through with this."

"Evidence tending to show state of mind is admissible as long as the declarant's state of mind is a relevant issue and the possible prejudicial effect of the evidence does not outweigh its probative value." *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990) (victim's statements about her husband's threats weeks before her disappearance were relevant to the issue of her relationship with her husband); *see also State v. Wynne*, 329 N.C. 507, 518, 406 S.E.2d 812, 817 (1991) (testimony concerning victim's fear shortly after being in defendant's presence shows victim's existing state of mind); *State v. Lynch*, 327 N.C. 210, 222, 393 S.E.2d 811, 818 (1990) (evidence of threats of defendant to victim shortly before the murder admissible to show victim's then existing state of mind); *State v. Faucette*, 326 N.C. 676, 683, 392 S.E.2d 71, 74 (1990) (victim's statements regarding defendant's threats shortly before the murder admissible).

The conversations between Mrs. Adams and the three witnesses related directly to Mrs. Adams' fear of defendant and were admissible to show Mrs. Adams' then existing state of mind at the time she made the statements. *State v. Meekins*, 326 N.C. 689, 694-95, 392 S.E.2d 346, 348-49 (1990). Contrary to defendant's contention, Rule 803(3) does not refer to the victim's state of mind at the time of death, but refers to the victim's state of mind at the time the statements were made. N.C.G.S. § 8C-1, Rule 803(3) (1992).

Defendant further contends that even if the statements were relevant to show the relationship between the parties or Mrs. Adams' state of mind, the statements' prejudicial effect far outweighed any probative value since several of the statements were made long before the date of the murders and the most recent discussion about his threats occurred six months before the murders.

In this case, the victim told several persons about defendant's numerous threats to harm her. In addition, Ms. McMillian personally witnessed several incidents in which defendant threatened his mother's life. The evidence tended to show a stormy relationship over a period of years leading up to the murders in this case,

and the fact that the last incident testified to occurred six months prior to the murders does not deprive the evidence of its probative value. *See State v. Syriani*, 333 N.C. 350, 377, 428 S.E.2d 118, 132 (1993) (remoteness generally goes to weight of evidence, not admissibility). We conclude that the testimony of the three witnesses was relevant to show the relationship between the victim and defendant.

"Notwithstanding its relevancy, evidence may nevertheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." N.C.G.S. § 8C-1, Rule 403 (1992). "Unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." *State v. DeLeonardo*, 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986); Commentary, N.C.G.S. § 8C-1, Rule 403 (1992). The trial judge is charged with the responsibility of making the initial determination of whether the probative value of relevant evidence is outweighed by its tendency unfairly to prejudice defendant. *State v. Meekins*, 326 N.C. at 696, 392 S.E.2d at 349. Considering the eyewitness testimony of Wesley Jr. and his wife, it does not appear that the statements in question had any undue tendency to suggest decision on an improper basis. Thus, we agree with the trial court's conclusion that the probative value of the evidence is not outweighed by any danger of unfair prejudice.

## II.

[2]   In defendant's second assignment of error, he contends that the trial court erred in failing to reinstruct the jury on voluntary intoxication when the jury asked the court to review the instructions on first-degree murder in the deaths of Mrs. Adams and Mr. Adams. During the charge conference, defense counsel requested the pattern jury instruction on voluntary intoxication regarding the inability to formulate specific intent to commit first-degree murder. The trial court gave the pattern instruction, applying it both to the two charges of first-degree murder and to the charge of assault with a deadly weapon with intent to kill. The trial court first defined the elements of each charge and its lesser included offenses, then applied the voluntary intoxication instruction to the specific intent requirement of first-degree murder and assault with a deadly weapon with intent to kill.

Approximately thirty minutes after the jury left the courtroom to begin deliberations, the jury returned and the foreman requested

that the trial judge provide the jury with "the five things in order to—the charge of Mildred Adams, the burden that we need to, that we're charged with in order to find the defendant guilty of murder in the first degree." The trial judge then asked the foreman if what he wanted was a list of the things that the State would have to prove before it could find the defendant guilty, and the foreman responded, "Yes, sir." The trial court read to the jury the original jury instruction on first-degree murder as to Mrs. Adams, which described the elements of malice, proximate causation, specific intent, premeditation and deliberation, concluding, "[a]nd those are the five things the state must prove beyond a reasonable doubt." The judge then inquired, "Does that answer your request?" The foreman responded, "Yes, sir." After the jury returned to the jury room, the trial judge asked if there were any requests for corrections. Defense counsel responded in the negative.

On the following morning after court had reconvened, the jurors returned to the courtroom and the foreman told the trial court, "We would like for you to go over the law of murder of Wesley Adams, Sr., and six qualifying things that we need to prove for first degree murder." In response to this request the trial court read the original jury instruction as to the first-degree murder of Mr. Adams, which included the law of self-defense in addition to the other five elements. Upon the completion of the reinstruction, the trial court inquired, "Do you also want to hear the remainder of the instructions?" The foreman responded, "No, sir, it's not necessary." After the jury returned to the jury room, the trial judge again asked if there were any requests for corrections. Defendant's attorney responded in the negative.

Defendant now contends that the trial court erred by not reinstructing the jury on voluntary intoxication. We find this contention to be without merit. The request by the jury to be reinstructed on certain elements of the law of murder as it applied to Mrs. Adams and Mr. Adams was specific, and the trial court reinstructed accordingly. In addition, after reinstructing the jury on both occasions, the trial court asked trial counsel if there were any requests for corrections to the instructions. Defense counsel made no objection and did not request any corrections. This assignment of error is rejected.

STATE v. McHONE

[334 N.C. 627 (1993)]

## III.

**[3]** In his third assignment of error, defendant contends that the trial court erred by allowing the prosecutors to make grossly prejudicial closing arguments in the guilt and sentencing phases of the trial. Defendant argues that the prosecutors "employed a barrage of impermissible ploys during their summations in the guilt and sentencing phases," and the "ploys were sufficiently prejudicial to warrant intervention by the trial court *ex mero motu* and amount to plain error." Examples of the ploys include: the prosecutor's references to the defendant as "one-eyed Jack," the prosecutor arguing facts that were not in evidence, irrelevant law, misstatements of the law, improper biblical references, and misstatements of expert testimony. The transcript in this case indicates that defendant did not object to the prosecutors' statements which are now at issue.

"Control of counsel's argument is largely left to the trial court's discretion." *State v. Robinson*, 330 N.C. 1, 31, 409 S.E.2d 288, 305 (1991) (citing *State v. Whisenant*, 308 N.C. 791, 798, 303 S.E.2d 784, 788 (1983) ); *State v. Covington*, 290 N.C. 313, 328, 226 S.E.2d 629, 640 (1976). When a defendant does not object to an alleged improper jury argument, the trial judge is not required to intervene *ex mero motu* unless the argument is so grossly improper as to be a denial of due process. *State v. Robinson*, 330 N.C. at 31, 409 S.E.2d at 305 (citing *State v. Zuniga*, 320 N.C. 233, 257, 357 S.E.2d 898, 914, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987) ). After reviewing the transcript, we conclude that the arguments of the prosecutors were not so grossly improper as to constitute a denial of defendant's due process rights.

## IV.

**[4]** In defendant's fourth assignment of error, he contends that the trial court erred in the sentencing phase of his trial by failing to submit for the jury's consideration the statutory mitigating circumstance that defendant had no significant history of prior criminal activity. *See* N.C.G.S. § 15A-2000(f)(1) (1988). Defendant filed a written request with the trial court seeking submission of four statutory and thirteen nonstatutory mitigating circumstances. His request did not include the statutory mitigating circumstance that defendant had no significant history of prior criminal activity. However, defendant did request a nonstatutory mitigating circumstance that "defendant has not previously been convicted of a violent crime." The trial court held a charge conference with counsel regarding

STATE v. McHONE

[334 N.C. 627 (1993)]

the submission of mitigating circumstances to the jury and reviewed the evidence to support the submission of each circumstance requested by defendant. This discussion included a determination that the nonstatutory circumstance requested by defendant—that he had not previously been convicted of a violent crime—would be submitted to the jury. The trial court gave a peremptory instruction to the jury on this mitigating circumstance, and the jury found it to exist as to each murder.

In *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988), this Court stated that it is the trial court's duty "to determine whether a rational jury could conclude that defendant had no significant history of prior criminal activity." If the trial court determines that a rational juror could conclude that defendant does not have a significant history of prior criminal activity, the mitigating circumstance must be submitted to the jury. The jury must then decide whether the evidence is sufficient to constitute a significant history of criminal activity. *State v. Artis*, 325 N.C. 278, 314, 384 S.E.2d 470, 490 (1989), *sentence vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). The word "significant" means:

> that the activity is likely to have influence or effect upon the determination by the jury of its recommended sentence . . . . In other words, the prior criminal activity could be found by the jury to be completely irrelevant to the issue of sentencing. The prior activity of the defendant could be found by the jury to be completely unworthy of consideration in arriving at its decision. There could be evidence of prior criminal activity in one case that would have no influence or effect on the jury's verdict, which, in another case, could be the pivotal evidence.

*Id.* (quoting *Wilson*, 322 N.C. 117, 147, 367 S.E.2d 589, 609 (Martin, J., concurring)). A "trial court is not required to instruct upon a statutory mitigating circumstance unless substantial evidence has been presented which would support a reasonable finding by the jury of the existence of such circumstance." *State v. Laws*, 325 N.C. 81, 110, 381 S.E.2d 609, 626 (1989), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573 (1991).

In the present case, the evidence before the trial court at the sentencing hearing shows that prior to murdering his mother

and stepfather, and shooting his half-brother, this twenty-year-old defendant had prior convictions for: a provisional license violation, failure to stop at the scene of an accident, possession of an alcoholic beverage by a person under twenty-one years of age, being drunk and disruptive in public, fourteen counts of felonious breaking and entering, thirteen counts of felonious larceny, and one count of conspiracy to break and enter. In addition, defendant's expert witness, Dr. James Groce, a psychiatrist, testified before the jury that defendant told him that he was convicted at age seventeen for stealing a woman's pocketbook to get drugs and that he had also broken into approximately sixty houses to support his drug problem.

"It is not merely the number of prior criminal activities, but the nature and age of such acts that the trial court considers in determining whether by such evidence a rational juror could conclude that this mitigating circumstance exists." *Artis*, 325 N.C. at 314, 384 S.E.2d at 490. In the present case, defendant's criminal activity exceeds the criminal activity found insufficiently substantial to preclude submission of the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance. *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (error not to submit mitigating circumstance where criminal history included a guilty plea to second-degree kidnapping of defendant's wife, testimony that defendant had stored illegal drugs in his shed, and evidence of his complicity in a theft); *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316 (1988), *sentence vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 329 N.C. 662, 407 S.E.2d 218 (1991) (two twenty-year-old felonies plus more recent alcohol related misdemeanors); *State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds*, 321 N.C. 570, 364 S.E.2d 373 (1988) (extensive record, but all felonies had occurred more than eighteen years prior to the homicide).

We find defendant's prior criminal activity to be more similar to that of defendants in those cases where we have found the activity too extensive to require the submission of the mitigating circumstance that defendant had no significant history of prior criminal activity. *Artis*, 325 N.C. 278, 384 S.E.2d 470 (court properly refused to submit mitigating circumstance where history included several assaults, assault with a deadly weapon, larcenies, and numerous driving violations); *State v. Stokes*, 308 N.C. 634, 304 S.E.2d 184 (1983), *appeal after remand*, 319 N.C. 1, 352 S.E.2d

653 (1987) (court properly refused to submit mitigating circumstance where history included several larcenies, several breaking and enterings, possessing and using marijuana all within a five-year period).

Based on the evidence in the record, we are convinced that no rational juror could have found that defendant had no significant history of prior criminal activity. Thus, the trial court did not err by not submitting the (f)(1) mitigating circumstance to the jury.

## V.

[5]   In defendant's fifth assignment of error, he contends that he "is entitled to an evidentiary hearing on the issue of his knowing consent to defense counsel's admission of his guilt and sanctioning of the death penalty." During the sentencing phase, as part of his closing argument, defense counsel stated:

> And if killing Steve McHone and taking him down to Raleigh and snuffing out his life, if it would bring Mr. and Mrs. Adams back I would say to you, kill, kill Steve McHone; kill him if it would bring Mr. and Mrs. Adams back. . . . If [defendant] could stop the clock and turn back the hands of time I submit to you that he would want them alive today. . . . Is [defendant] going to prison for life . . . where he can make peace with his maker. . . . Ladies and gentlemen, give him that chance. That's all we're asking . . . ."

We have reviewed the transcript in this case, and we find that defense counsel did not admit defendant's guilt during the closing arguments of defendant's sentencing hearing. Defense counsel's argument, when read in its entirety, neither endorsed nor sanctioned the death penalty. Defendant had already been convicted of the two first-degree murders during the guilt-innocence phase of his trial. Defense counsel was now pleading with the jury not to return with a sentence of death.

Defendant bears the burden of proving any constitutionally deficient performance by his trial counsel and actual prejudice. *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985). We do not find defense counsel's arguments here to be constitutionally deficient; rather, we are convinced that defense counsel made every effort during closing arguments to convince the jury not to recommend a sentence of death for his client. We therefore conclude that defendant is not entitled to an evidentiary hearing.

STATE v. McHONE

[334 N.C. 627 (1993)]

## VI.

[6] In defendant's sixth assignment of error, he contends that the trial court's instruction regarding transferred intent on the charge of the first-degree murder of Mr. Adams erroneously relied upon an unconstitutional, conclusive presumption. Defendant acknowledges that the trial court's instruction on transferred intent follows North Carolina law. *State v. Locklear*, 331 N.C. 239, 415 S.E.2d 726 (1992). However, defendant argues that the instruction created a conclusive presumption that eradicates defendant's right to have the State meet its burden of proof.

This Court recently addressed and rejected this contention in *State v. Locklear*, 331 N.C. at 244, 415 S.E.2d at 730. Defendant does not raise any additional arguments which were not addressed in *Locklear*. We therefore reject this assignment of error.

## VII.

[7] Finally, defendant contends that the North Carolina death penalty statute — and consequently the death sentence in this case — is unconstitutional, imposed in a discriminatory manner, vague and overbroad, and involves subjective discretion, all in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 27 of the North Carolina Constitution.

Defendant concedes that on numerous occasions this Court has upheld the constitutionality of the North Carolina death penalty statute. *See State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985); *State v. Boyd*, 311 N.C. 408, 319 S.E.2d 189 (1984), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985); *State v. Maynard*, 311 N.C. 1, 316 S.E.2d 197, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984); *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983); *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982). However, defendant requests this Court to reexamine its prior holdings and vacate the death sentences in this case. Defendant makes no contentions not previously considered by this Court. Therefore, this assignment of error is rejected.

STATE v. McHONE

[334 N.C. 627 (1993)]

PROPORTIONALITY

[8] Defendant makes no argument that: 1) the record does not support the jury's finding of an aggravating circumstance; or 2) the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; or 3) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. However, this Court is required to address these issues before it may affirm a sentence of death. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E.2d 279, 315, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

In the first-degree murder of defendant's mother, the jury found the one aggravating circumstance which was submitted— "[w]as this murder part of a course of conduct in which the defendant engaged and did that course of conduct include the commission by the defendant of other crimes of violence against other persons?" The jury also found both of the aggravating circumstances which were submitted in the first-degree murder of defendant's stepfather. Those circumstances were: 1) was this murder committed while the defendant was engaged in an attempt to commit any homicide upon some person other than the deceased?, and 2) was this murder part of a course of conduct in which the defendant engaged and did that course of conduct include the commission by the defendant of other crimes of violence against other persons?

The evidence at trial showed that defendant committed crimes of violence against three of his family members on 3 June 1990. Defendant fired a shotgun point-blank at his half-brother, injuring his half-brother and killing his stepfather who stepped between them. This occurred minutes after defendant had shot his own mother in the head. The evidence clearly supports the jury's finding of the aggravating circumstance in the first-degree murder of Mrs. Adams and the aggravating circumstances found in the first-degree murder of Mr. Adams.

Further there is nothing in the record that suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review.

In conducting proportionality review, "[we] determine whether the death sentence in this case is excessive or disproportionate

STATE v. McHONE

[334 N.C. 627 (1993)]

to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown*, 315 N.C. 40, 70, 337 S.E.2d 808, 829. We compare similar cases in a pool consisting of:

> all cases arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146 (quoting *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983)).

The proportionality pool includes only those cases found to be free of error in both phases of the trial. *State v. Jackson*, 309 N.C. 26, 45, 305 S.E.2d 703, 717 (1983). However, this Court is not required to give a citation to every case in the pool of similar cases used for comparison. *State v. Williams*, 308 N.C. at 81, 301 S.E.2d 335 at 356. The Court's consideration of cases in the pool focuses on those cases "which are roughly similar with regard to the crime and the defendant . . . ." *State v. Syriani*, 333 N.C. 350, 401, 428 S.E.2d 118, 146 (quoting *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985)).

In the present case defendant killed his mother and his stepfather in their home. For years, the defendant had threatened to physically harm and kill his mother. Defendant also assaulted his half-brother with the intent to kill him, and threatened, if allowed to live, to "hunt down and finish off" his half-brother's family after being released from jail.

As to the charge of first degree murder of defendant's mother, the jury found the following mitigating circumstances: 1) the murder was committed while the defendant was under the influence of mental or emotional disturbance, 2) the defendant had a history of long-term substance abuse and on the night of the offense was under the influence of alcohol, 3) the defendant had shown remorse for the crime committed, 4) the defendant enjoyed a normal childhood until the time his parents separated, and after that, he began abus-

STATE v. McHONE

[334 N.C. 627 (1993)]

ing drugs and alcohol, 5) the defendant had previously sought help for his substance abuse problems, 6) defendant's father abused alcohol and gambled excessively and defendant, while he was a child, often spent time with his father in bars while his father drank and gambled, 7) defendant often witnessed arguments between his father and mother; 8) defendant had not previously been convicted of a violent crime, 9) defendant, while he resided with his father, was often left alone at night, without supervision, while his father worked third shift, 10) defendant, while he resided with his father, often had to reside in undesirable places, and 11) any other circumstance(s) arising from the evidence which one or more of the jurors deemed to have mitigating value.

As to the charge of first degree murder of defendant's stepfather, the jury found the same mitigating circumstances as in the murder of his mother with the exception of "the defendant had shown remorse for the crime committed."

On both charges the jury found that the aggravating circumstances outweighed the mitigating circumstances and that the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty when considered with the mitigating circumstances found by one or more jurors. After considering the crime and the defendant, we cannot hold as a matter of law that the death sentences recommended by the jury in this case are disproportionate to the penalties imposed in similar cases. As the majority of this Court observed in a recent case:

> This Court has found the death sentence disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds, State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). In none of these cases was the defendant convicted of more than one murder.

*State v. McNeil*, 324 N.C. 33, 59-60, 375 S.E.2d 909, 925 (1989), *sentence vacated*, 494 U.S. 1050, 108 L. Ed. 2d 756 (1990), *on remand*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, --- U.S. ---, 113 L. Ed. 2d 459 (1991).

In the instant case, defendant was convicted of two first degree murders — his mother and his stepfather. As we said in *State v. Robbins*, 319 N.C. 465, 529, 356 S.E.2d 279, 316 (1987), *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987), "a heavy factor against [the defendant] is that he is a multiple killer." This Court has affirmed the death penalty in several cases involving death or serious injury to one or more persons other than the murder victim. *See Robbins*, 319 N.C. 465, 356 S.E.2d 279; *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985), *reh'g denied*, 471 U.S. 1050, 85 L. Ed. 2d 342 (1985); *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308 (1983), *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983); *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203 (1982), *overruled in part*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788 (1981), *cert. denied*, 464 U.S. 1065, 79 L. Ed. 2d 207 (1984).

We recognize that there are multiple murder cases in the pool where the jury has returned a life sentence. Some of them, like the instant case, involved the killing of members of the defendant's family. For example, the jury recommended a life sentence in *State v. Shytle*, 323 N.C. 684, 374 S.E.2d 573 (1989), where the defendant murdered her husband and her son. She also shot and injured her daughter, then shot herself in the head. At trial, the defendant relied on a defense of insanity and presented expert testimony that she did not know the difference between right and wrong in relation to shooting her family members. *Id.* at 687, 374 S.E.2d at 576-77. *Shytle* may be distinguished from the instant case based on the evidence of insanity and attempted suicide by the defendant.

Another such example is *State v. Evangelista*, 319 N.C. 152, 353 S.E.2d 375 (1987). There, the defendant held his sister, nephew and niece hostage; then, he killed his sister and nephew. At trial, he relied upon a defense of insanity and presented evidence tending to show that during the siege, he suffered from paranoia. *Id.* at 156, 353 S.E.2d at 379. Several psychologists testified to the effect that the defendant was under the delusion that Colombian commandos were trying to kill him and his family. *Id.* There was also extensive testimony by expert witnesses that "[the defendant's] paranoia affected his actions, and he was incapable of knowing right from wrong in relation to the acts charged." *Id.* at 162, 353 S.E.2d at 383. No such evidence of insanity was presented in the instant case.

STATE v. McHONE

[334 N.C. 627 (1993)]

We are not unmindful of the fact that the defendant was only twenty years of age at the time of the homicides. We note first that the age of the defendant was submitted to the jury as a possible mitigating circumstance, but the jury did not find defendant's age to be mitigating as to either murder. This is understandable in view of defendant's substantial criminal history over a period of several years. We also observe that while the General Assembly has limited the circumstances under which persons of tender years can be sentenced to death,[1] several juries have recommended sentences of death notwithstanding the youthful age of the defendant. *See, e.g., State v. McCollum,* 334 N.C. 208, 433 S.E.2d 144 (1993) (defendant age nineteen); *State v. Pinch,* 306 N.C. 1, 292 S.E.2d 203 (defendant age nineteen); *State v. Rook,* 304 N.C. 201, 283 S.E.2d 732 (1981) (defendant age twenty-one).

After a thorough review of the transcript, record on appeal, the briefs of both parties, and the oral arguments of counsel, we find that the record fully supports the jury's written findings in aggravation in the death of both victims. We further conclude that the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor. We hold that defendant received a fair trial and sentencing proceeding, free of prejudicial error. After comparing this case, where defendant killed his defenseless mother by shooting her in the back of the head and also shot and killed his stepfather, to similar cases in the pool, we cannot hold as a matter of law that the sentence of death is disproportionate or excessive. Therefore, the judgments of the trial court must be and are left undisturbed.

NO ERROR.

Justice PARKER did not participate in the consideration or decision of this case.

---

1. N.C.G.S. § 14-17 (defendant under seventeen years of age at time of commission of first-degree murder may not be sentenced to death unless murder committed while serving or on escape from serving sentence for previous murder).