Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILKINS concurred. Judge GREGORY wrote a separate opinion concurring in part and dissenting in part.
LUTTIG, Circuit Judge.
Petitioner, Steven Van McHone, appeals from the district court’s denial of his 28 U.S.C. § 2254 habeas petition. In accordance with 28 U.S.C. § 2253(c), we granted McHone a certificate of appealability in order to address the claims he raises under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *696 Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because we conclude that the North Carolina Supreme Court’s disposition of these claims was neither contrary to, nor an unreasonable application of, established federal law, we affirm.
I.
The North Carolina Supreme Court and the district court have thoroughly recounted the facts of Steven McHone’s murders of his mother, Mildred Adams, and his stepfather, Wesley Adams, Sr., see State of North Carolina v. McHone, 334 N.C. 627, 435 S.E.2d 296, 298-301 (1993); J.A. 817-22. We set forth only the facts relevant to the issues on appeal, as established by the witnesses who testified at McHone’s trial.
Wendy Adams testified that at 12:30 a.m. on June 3, 1990 she, her husband Wesley Adams, Jr., their son Alex, and Wesley, Jr.’s parents Mildred Adams and Wesley Adams, Sr., returned to Mildred and Wesley, Sr.’s home after a day of fishing. Steven McHone, an occupant of the house, was already there. While getting Alex ready for bed, Wendy overheard Wesley, Sr. and Mildred arguing with McHone about money. Thereafter, Mildred came to their room inquiring about a missing pistol. Subsequently, Wesley, Jr. and Wendy heard three gunshots. As Wesley, Jr. went out into the hall to investigate, Wendy heard someone coming up the basement stairs and then overheard Wesley, Sr. tell Wesley, Jr. to call 911.
Wesley, Jr., a Captain in the United States Air Force, testified that while he was talking with the 911 operator he briefly saw McHone wrestling with Wesley, Sr. before they disappeared from sight. About a minute later, Wesley, Sr. reappeared and told Wesley, Jr. that his mother was “face down out back.” As Wesley, Sr. approached Wesley, Jr., McHone appeared in the doorway and shot Wesley, Sr. in the chest with a shotgun. Wesley, Jr., after a lengthy scuffle, managed to disarm McHone. Thereafter, McHone cursed at Wesley, Jr. and threatened that if Wesley, Jr. did not kill him he would hunt Wesley, Jr. and his family down and “finish them off.” McHone, 435 S.E.2d at 299.
McHone did not dispute that he killed Mildred and Wesley, Sr. and assaulted Wesley, Jr. Rather, he presented a voluntary intoxication defense, claiming that his consumption of alcohol and LSD prevented him from forming the requisite mental state for first degree murder. During sentencing, McHone presented his impaired mental state in mitigation. McHone attempted to establish his impairment through the testimony of Jimmy McMillian and Tammy Bryant.
McMillian testified that over the course of June 2, 1990 he and McHone split one and one-half pints of Jack Daniels and that, in addition, McHone drank a pitcher of beer. McMillian testified that McHone’s physical and mental faculties were appreciably impaired because he had a “slushy mouth.” Id. at 300.
Bryant, McHone’s girlfriend, testified that she saw McHone on the evening of June 2 at a party at the home of Ronald Speaks. Bryant testified that, when McHone arrived at the party, his speech was slurred and that he was staggering. She further testified that McHone got into a fight while at the party and began “swinging a gun around in everyone’s face, threatening everybody, moving real swiftly and quickly.” When Bryant asked McHone “what he was on,” McHone responded, “I have taken a couple of hits of acid.” Id.
McHone also presented expert testimony from Dr. James Groce and Dr. John Frank Warren, III. Both testified that McHone had a serious substance abuse problem. Id. at 301.
*697 The state presented the testimony of Tammy Sawyers to rebut McHone’s intoxication defense. Sawyers, who did not drink any alcohol on June 2, testified that she and McHone had a conversation while driving to Speaks’ house and that McHone’s speech was fine and that McHone was able to walk “fine” to and from her vehicle. She also testified that she was with McHone from 3:00 p.m. on June 2 until 2:00 a.m. the next morning, that she was never out of his presence for more than five minutes, and that she did not observe him take any controlled substances. Id.
The jury convicted McHone of two counts of first degree murder, one each for killing his mother, Mildred, and his stepfather, Wesley, Sr. The jury also convicted McHone of one count of assault with a deadly weapon with intent to kill, for his attack on his step-brother, Wesley, Jr. After finding one aggravating factor and eleven mitigating factors as to the murder of Mildred, id. at 579-81, and two aggravating factors and ten mitigating factors as to the murder of Wesley, Sr., id. at 582-85, the jury recommended, and the trial court imposed, the death penalty for each first degree murder. McHone, 435 S.E.2d at 298. McHone unsuccessfully sought direct and post-conviction review in the North Carolina courts, id.; J.A. 731-775; State of North Carolina v. McHone, 350 N.C. 825, 539 S.E.2d 642 (1999), and his federal ha-beas petition was denied on the merits by the district court. J.A. 873. Pursuant to the certificate of appealability issued by this court, the instant appeal followed.
II.
McHone claims that the state’s failure to disclose evidence located in State Bureau of Investigation (SBI) files entitles him to relief under Brady v. Maryland. McHone’s Brady claims did not receive extensive treatment in the Superior Court and in the North Carolina Supreme Court. J.A. 774; McHone, 539 S.E.2d at 642 (“This court having thoroughly considered the matters raised ... and having determined that none require further evidentia-ry hearing and that none merit any further grounds for relief, the motion is therefore denied.”). Nonetheless, the determination by those courts that McHone was not entitled to relief under Brady constitutes an adjudication on the merits of that claim. See Bacon v. Lee, 225 F.3d 470, 478 (4th Cir.2000). Accordingly, under section 2254(d), we “confine our review to whether the [state] court’s determination resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.” Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir.2000) (en banc). The district court concluded that petitioner did “not [meet] the AEDPA standards for this claim,” and we agree.
In order for a petitioner to obtain relief under Brady, “(1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; [and] (3) the suppression must have been material, i.e., it must have prejudiced the defense at trial.” Monroe v. Angelone, 323 F.3d 286, 299 (4th Cir.2003); Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (exculpatory evidence is material “if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.”) (emphasis added). Materiality is not considered item by item, rather it must be assessed collectively. Id. at 436, 115 S.Ct. 1555.
The district court assumed that the government did not turn over the evidence in question, J.A. 835, and we assume the same.
A.
McHone identifies the statements of seven individuals — Wesley Adams, Jr., Wendy *698 Adams, Randy Adams, Tammy Sawyers, Mark Tuttle, Deputy Inman, and William Kent Hall — that he contends were improperly withheld by the government.
As to the first statement, that of Wesley Adams, Jr., Officer L. Perry summarized Wesley, Jr.’s statement to investigators immediately after the crime as follows:
Wes ... overheard Steve and his mother quarreling in the kitchen. Steve was obviously drunk and was complaining to his mother that he wanted his money which she was holding for him. J.A. 617;
* * * * * *
Steve continued to argue with his mother and step-father. Wesley, Sr. told Steve to go downstairs in the basement and sleep it off. Id.;
* * :|: * * ‡
Wes advised that he smelled a strong odor of alcohol on Steve on this occasion. He was not aware of what amount Steve may have drunk or if he had taken any drugs. Steve was not stuttering and appeared to know what he was doing the entire time. He was able to fight both him (Wes) and his father and was able to “put up a pretty good fight.” Steve was not remorseful at all after the shooting was over. Steve even told Wes ... that “You’d better kill me or I’ll come back and kill you, your wife, and child.” Id. at 619[.]
Wesley, Jr. testified at McHone’s trial. He testified as follows:
Q. Did you notice any odor of alcohol about Steve that night? A. I didn’t notice any. Q. During this argument did you know that he had been drinking? A. The only indication I had, the only mention of drinking at all during the argument was the fact that my father told him to go to bed and sleep it off. Id. at 290;
‡ ‡ ‡ # ‡ *
Q. Do you have an opinion ... based on your experience [including substance abuse detection training in the Air Force] as to whether defendant was impaired ... ? A. I neither heard, saw, or felt any type of impairment ... By impairment I meant that any dysfunction of his physical movements; any slow movement, jerking, stumbling, tripping; any impairment in his voice characteristics by slurring his speech or not being able to finish a sentence.
Id. at 281-282; see also id. at 250-252 (testifying that McHone was “aware” and “responsive” while arguing with his parents and that he did not have trouble walking to his room); id. at 271 (describing McHone’s “acrobatic moves” during the scuffle); id. at 273-74 (testifying that McHone “put up a good fight”); id. at 279-280 (testifying that, during the 40 minutes that Wesley, Jr. fought and subdued McHone, McHone’s speech was understandable, he easily handled the shotgun, and he was “extremely dexterous”); id. at 298-99 (testifying that Wesley, Jr.’s scuffle with McHone was extended because McHone was “in full control of his faculties”).
In material respects, Wesley, Jr.’s pretrial and trial statements are consistent, even if at first blush, as the district court said, Wesley, Jr.’s “pretrial statements that petitioner was ‘obviously drunk’ and smelled of alcohol versus his trial testimony that petitioner did not appear impaired in any way and did not smell of alcohol ... appear inconsistent.” Id. at 827. Wesley, Jr.’s pretrial statement was that McHone knew what he was doing throughout the commission of the murders — i.e., he was not impaired — and is thus fully consistent with his trial testimony to that effect. In *699 his pretrial statement, Wesley, Jr. described McHone’s fight with Wesley, Sr., noting that “Steve had the revolver in his hand and was trying to shoot Wesley, Sr.,” that “Wesley, Sr. and Steve were swapping punches the entire time,” that after Wesley, Sr. thought he had knocked out McHone that McHone acquired a shotgun and “pointed it directly at ... his father” and “pulled the trigger,” and that after-wards Wesley, Jr. and McHone “struggled over the gun.” Id. at 618-19. In summarizing McHone’s physical and mental presence during these events Wesley, Jr. told Officer Perry that “Steve was not stuttering and appeared to know ivhat he was doing the entire time. He ivas able to fight both him (Wes) and his father and was able to put up a ‘pretty good’ fight. Steve ivas not remorseful at all after the shooting was over." Id. at 619. Thus, Wesley, Jr.’s statements to the SBI and his trial testimony are consistent on the issue of impairment, which is the only issue that bears directly on the guilt-phase question of McHone’s ability to form specific intent and on the sentencing-phase question of the applicability of the impairment mitigator.
The district court noted apparent inconsistencies between Wesley, Jr.’s trial testimony and his pretrial statements regarding his observations of the indicia of McHone’s consumption of alcohol. Any inconsistency, however, is limited in scope and does not bear directly on the question of McHone’s ability to form specific intent or the applicability of the impairment miti-gator. As noted above, in his pretrial statement Wesley, Jr. described overhearing McHone’s argument with his mother and concluded that McHone was “obviously drunk.” At trial, describing an argument between McHone and Wesley, Sr. and in response to the question “[d]ur-ing this argument did you know that he [McHone] had been drinking?”, Wesley Jr. testified that “[t]he only indication I had, the only mention of drinking at all during the argument was the fact that my father told him to go to bed and sleep it off.” Id. at 290. Thus, Wesley, Jr.’s testimony regarding the evidence of drinking during McHone’s argument with his stepfather is unrelated to, and not inconsistent with, his pretrial observations regarding McHone’s earlier argument with his mother which apparently was not the subject of his trial testimony. Moreover, consistent with his trial testimony, Wesley, Jr. told Officer Perry that “Wesley, Sr. told Steve to go ... sleep it off.” Id. at 617. Similarly, the only evidence Wesley Jr. described in his pretrial statement in support of his observation that McHone was obviously drunk during the argument with his mother was that she “told Steve to go downstairs and sleep it off.” Id. Accordingly, Wesley Jr.’s pretrial statement and trial testimony are largely consistent, and certainly consistent in material respects, the only inconsistency limited to Wesley, Jr.’s observation to Officer Perry that “he smelled a strong odor of alcohol on Steve” and his trial testimony to the contrary.[1] *700 We are unwilling to find, based on this single, immaterial inconsistency, that the undisclosed evidence is “favorable” under Brady. Nonetheless, we will assume such. Even on this assumption, however, we conclude that Wesley, Jr.’s pretrial statement is not material.
At best, McHone might have used the inconsistency in Wesley, Jr.’s statements as to the existence of a smell of alcohol to attempt to impeach Wesley, Jr. See United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (“Impeachment evidence ... as well as exculpatory evidence, falls within the Brady rule.”). But the impeachment value of this inconsistency is low because the defense had ample testimony regarding McHone’s consumption of alcohol that it could have used to attempt to impeach Wesley, Jr. Numerous state witnesses, including Tammy Sawyers and police officers Inman and Miller, testified that McHone had consumed a substantial amount of alcohol. J.A. 828-829 (district court reaching the same conclusion). Indeed, Tammy Sawyers testified that McHone was “drunk” though understandable and able to walk, id. at 399, and that over the course of the day he consumed two cans of beer, “two pitchers of beer,” and “over two and a half pints of liquor.” Id. at 405. And, at sentencing, the jury found the mitigating factor that “[t]he defendant has a history of long-term substance abuse and on the night of the offense was under the influence of alcohol." Id. at 579; 583 (emphasis added). Thus, the jury’s failure to consider additional, cumulative evidence relating to the undisputed fact that McHone had consumed a vast quantity of alcohol does not “put the whole case in such a different light as to undermine our confidence in the verdict.” Kyles, 514 U.S. at 434, 115 S.Ct. 1555; United States v. Ellis, 121 F.3d 908, 918 (4th Cir.1997) (“[P]ost-Kyles we do not ignore other evidence presented at trial in determining confidence in the outcome. Instead, we evaluate the whole case, taking into account the effect that the suppressed evidence, had it been disclosed, would have had on the evidence considered at trial.”).[2]
Turning next to the allegedly inconsistent statements of Wendy Adams, Adams said the following in an interview with Detective Terry Miller:
Adams: [McHone said] T can’t go on living like this,’ that may have been part of the argument that was going on in the kitchen.... But I remember him saying that that night, ... but he didn’t even sound, he did not sound incoherent, or anything else, he just sounded mad. J.A. 607;
Miller: You all mentioned earlier about him being drunk or drugged or both,[3] but Wendy mentioned also that he was *701 very coherent, that was my observation when I got there ...
Adams [Wendy]: Well, a lot of people, well, personally, I don’t know a lot of people that would cuss and scream like that if they weren’t drunk ... I know a lot of people get real belligerent when they get drunk and always, when I had been around Steve before, he was real smooth when he was clean. Id. at 608.
Wendy Adams testified at McHone’s trial as follows:
Q. Did he stagger, stumble, have any trouble negotiating around the tables or whatever was in the house? A. No ... Q. Did you notice anything about his speech, that is being mumbled, mush-mouthed, or slurred in any way? A. No. It was slightly louder than normal. Id. at 122-23;
jK % * * ❖
Q. Based on what Randy told Mr. and Mrs. Adams, did they talk with Steven in your presence about alcohol or about being drunk, coming home drunk? A. I didn’t pick up on any of that. Id. at 159.
As even a cursory comparison of the pretrial and trial statements makes clear, Wendy Adams’ undisclosed statement cannot form the basis of a Brady violation because it is consistent with her trial testimony and is therefore not “favorable” to McHone. And, even if the undisclosed statement could somehow be used to impeach Wendy, it would not be material because at best it would be cumulative to the undisputed fact that McHone had consumed alcohol.
The SBI files also reveal that Wendy talked to Randy Adams, who had a telephone conversation with McHone on the evening of June 2, and that Randy told Wendy that McHone was intoxicated or impaired. Id. at 603. This evidence is not favorable to McHone. As the trial court held, Randy’s conversation with Wendy is inadmissible hearsay, id. at 159, and Randy’s statements about McHone’s earlier impairment — based merely on a telephone call — do not bear in any way on Wendy’s later observation of McHone. Because this undisclosed evidence is not inconsistent with Wendy’s trial testimony, it is not “favorable” under Brady.
In addition, petitioner contends that Wendy’s description at trial of the fight between Wesley, Sr. and McHone differs from her statement to police. At trial, Wendy testified that she heard a “scuffle” and a “struggle” and that “blows were exchanged.” Id. at 132-33. In her statement to police, Wendy said:
It sounded like he was dragging him up the basement steps, beating on him, I’m not sure, and then he, I thought he ... like, drug him, my impression was that he was beating Steve and had drug him into their bedroom and hit him again maybe, and thought he had knocked him out, and then left the room, maybe, I don’t know.
Id. at 605. This latter statement is not “favorable” because it is not inconsistent with Wendy’s trial testimony, in which she described Wesley, Sr. beating McHone on several occasions during the course of the “struggle” and also described hearing “hitting and dragging” coming from the basement steps. Id. at 132-137. And, the jury heard testimony from Wesley, Jr. that Wesley Sr. was very strong and that at one point it looked as though he had subdued McHone. Id. at 262-63.
Randy Adams told police that McHone called him at Mildred and Wesley, Sr.’s house on the night of the murders and asked him if he (McHone) could bring a girl home with him. Randy told him no and McHone, according to Adams, “got real upset with him over this and told [him] that he would kill him.” Id. at 622. Additionally, Randy told police that Mildred informed him that, based on her ob *702 servations, McHone was “drunk or doped up,” id, and a prosecution witness list notation indicated that Randy might testify that Mildred told him that McHone was “the worst [she had] ever seen him.” Id. at 660. Randy did not testify at trial, was not at the house when the murders were committed, and did not observe McHone on the evening of the murders. Id. at 622.
McHone would not have benefitted from Randy’s testimony and thus it does not support his Brady claim. As the district court observed, Randy’s statement was not favorable because it “contains the fact that McHone threatened to kill Randy over a minor matter shortly before he committed two murders.” Id. at 840. Moreover, Randy’s testimony about Mildred’s revelations regarding McHone’s condition would have added little to the cumulative evidence presented regarding McHone’s intoxication. Lastly, as the district court concluded, the notation on the prosecutor’s witness list is scribbled and ambiguous. It could relate to McHone’s emotional state, his impairment, or his meanness. Id.
McHone next claims that Tammy Sawyers’ statement to investigators, in which she described her conversations with McHone on the night of the murder, is Brady material. But McHone participated in these conversations and, accordingly, this evidence cannot form the basis of a Brady claim. See Hoke v. Netherland, 92 F.3d 1350, 1355 (4th Cir.1996)(“[W]here the exculpatory information is ... available to the defendant” or “lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine.”).
Similarly, under Hoke, McHone’s telephone call to his Alcoholics Anonymous sponsor, Mark Tuttle, approximately thirty minutes before the shootings, cannot form the basis of a Brady claim. Id. This evidence would not constitute Brady material in any event. In this conversation, McHone is described by the SBI as “sound[ing] upset and [as] crying” and as “not seem[ing] to be making much sense,” J.A. 611. But during the conversation McHone also said that he thought “someone was going to die that night.” Id. We agree with the district court that the unfavorable portion of the SBI’s report of this telephone conversation would have outweighed any exculpatory value because it “shows clearly that, just prior to the murders, petitioner was contemplating killing someone and sought help because he was aware it was wrong[, and that] [w]hen he did not receive the help he sought, he simply acted on the thoughts.” Id. at 838. This “would have been fatal to his claim that he was so impaired that he could not form an intent to kill.” Id.
Nor does Deputy Inman’s statement to the SBI support McHone’s Brady claim. Inman told the SBI that McHone had a “strong odor of alcohol” and that he did not appear to be “steady on his feet.” Id. at 602. At trial, Inman testified that McHone walked well enough, talked well enough, and was aware enough for him to form the overall opinion that he was not impaired. Id. at 179-180. Inman’s trial testimony that McHone “walked well enough” is not inconsistent with the portion of the SBI report referenced by petitioner, in which Inman noted that McHone smelled of alcohol and appeared unsteady. The portion of the SBI report not referenced by petitioner, in which Inman reported that McHone’s speech was not slurred and that he appeared to “know what was going on around him,” id. at 602, confirms that the two statements are indeed consistent and that they cannot form the basis of a Brady claim.
Last, McHone identifies as Brady material the statement of William Kent Hall, a medical first responder to the scene *703 of his crime, which includes Hall’s observation that McHone was “screaming and kicking the glass in the patrol car.” Id. at 675. But this statement is not favorable; it bears neither on impairment nor (helpfully to McHone) on petitioner’s state of mind at the time of the crime.
B.
Petitioner contends that the cumulative effect of the non-disclosed evidence would have “further undermined an already marginal first degree murder conviction,” Petitioner’s Br. at 28, because the trial was closely contested both as to premeditation and as to whether McHone’s intoxication prevented him from forming specific intent to kill. M[4] Petitioner also contends that the non-disclosed evidence would have been cumulatively material at sentencing because it might have caused the jury to find the mitigating circumstance under N.C. Gen.Stat. § 15A-2000(f)(6) (“the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired”).
Petitioner may benefit from the “cumu-lativeness” of evidence that is “favorable” under Brady. Here, however, only Wesley Jr.’s statement is even arguably favorable and, as discussed above, not even it is material. Moreover, as the district court concluded, even if all of the undisclosed evidence were favorable, it would not undermine confidence in the result of guilt or sentencing. J.A. 845. The jury heard testimony from state witnesses that McHone had consumed large quantities of alcohol and was “drunk,” from defense witnesses that McHone’s drunkenness caused him to be impaired, and from experts that McHone had a substance abuse problem. The jury’s verdict and determination at sentencing reflects their belief that while McHone was “under the influence of alcohol” when he committed the crime, id. at 579, 583, he was not impaired, and the trial testimony of Wesley, Jr., Wendy, and Inman pertaining to impairment is entirely consistent with their pretrial statements.
Petitioner contends that the undisclosed evidence is cumulatively material because, after reviewing this evidence, Dr. Groce, a sentencing-phase defense witness who admitted on cross examination that McHone “would have been able to form specific intent to commit the alleged crimes” (notably a guilt phase question), id. at 494-94, stated in a post-conviction affidavit — on the basis of the undisclosed evidence — that “I no longer have the opinion that Mr. McHone could form the specific intent to kill.” Id. at 688. Dr. Groce did not aver in his post-conviction affidavit that he held the opinion that McHone could not have formed the specific intent to kill; he said only that he no longer had *704 the opinion (to which he had previously testified) that McHone could form such an intent. We do not believe that the district court erred, in refusing to accord Dr. Groce’s conclusory affidavit any weight on the grounds that “Dr. Groce’s affidavit is far too conclusory .... He does not explain what materials he reviewed or what in the materials caused him to alter his opinions,” see id. at 847.
In sum, the North Carolina Supreme Court’s conclusion that McHone did not present a tenable Brady claim was not an “objectively unreasonable” application of federal law. Bell, 236 F.3d at 158.
III.
In order to establish a claim for ineffective assistance of counsel, McHone must show, first, that his trial counsel’s performance was deficient and, second, that the deficiency prejudiced McHone’s defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland’s “performance” prong, McHone must demonstrate that trial counsel’s performance fell below an objective standard of reasonableness as determined by comparison to “prevailing professional norms.” Id. at 688, 104 S.Ct. 2052. In addition, McHone must also show under Strickland’s prejudice prong that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052. If McHone fails to demonstrate sufficient prejudice from certain acts or omissions, we need not decide whether counsel’s performance in those respects was, in fact, deficient under Strickland. See id.
McHone claims that his trial counsel provided ineffective assistance because they (1) failed to investigate and present evidence of lack of specific intent, (2) failed to object to a portion of the prosecutor’s closing argument that incorrectly stated the law of voluntary intoxication, and (3) failed to uncover certain mitigating evidence from McHone’s childhood. The Surry Count Superior court, the North Carolina Supreme Court, and the district court rejected these claims on the merits.[5] For the reasons that follow, we see no reason to disturb these judgments.
A.
McHone’s first claim arises from the fact that counsel did not interview McHone’s alcoholics anonymous sponsor, Mark Tuttle; two jailors who observed McHone after the murders, Leroy Snow and *705 Charles Collins; McHone’s former substance abuse counselor, George Delp; McHone’s probation officer, Larry Cheney; and did not proffer expert testimony as to McHone’s blood alcohol content as it related to his ability to form the specific intent to kill.
Defense counsels’ failure to interview and present Mark Tuttle as a witness cannot form the basis of a Strickland claim because it was not prejudicial. Indeed, as discussed above, Tuttle would have testified that McHone contemplated murder just hours before he killed his parents. J.A. 611, 838. Any benefit McHone might have received from Tuttle’s general statements that McHone was “upset” and did not seem to be “making much sense”— statements which are notably cumulative with the testimony of McMillian and Bryant if not the testimony of the state’s witnesses — would surely have been offset by McHone’s prediction to Tuttle that “somebody was gonna die that night.” Id. at 611. That Tuttle’s testimony would have added little to help McHone is confirmed by the jury’s decision to recommend the death penalty notwithstanding its conclusion that McHone committed the murders “while he was under the influence of mental or emotional disturbance,” ie. upset. Id. at 579; 583.
Similarly, counsels’ failure to interview Leroy Snow and Charles Collins, two of McHone’s jailors, cannot form the basis of a Strickland claim. Snow, who observed McHone after he arrived at the Surry County jail, said that “it appeared ... that Steven had taken some kind of drugs or had consumed a lot of alcohol,” id. at 681, while Collins, who was on duty with Snow, said that “Steven ... appeared ... high on dope or a combination of drugs and alcohol,” that he “smelled very strongly of alcohol,” and that “his speech was slurred.” Id. at 689. As we concluded with respect to his Brady claim, McHone was not prejudiced by the absence of additional testimony pertaining to his consumption of alcohol and his level of impairment. The jury heard testimony from state witnesses that McHone had consumed large quantities of alcohol and was “drunk,” from defense witnesses that McHone’s drunkenness caused him to be impaired, and from experts that McHone had a substance abuse problem. And, the witnesses that testified at trial observed McHone in the time leading up to and during the murders, during which time, the jury concluded, McHone formed the requisite intent for first degree murder, while Snow and Collins did not observe McHone until several hours later.
McHone alleges further ineffectiveness in his counsels’ failure to interview George Delp, a Surry County substance abuse and mental health counselor who counseled McHone from November 1989 until March 1990. In his post-conviction affidavit, Delp stated that McHone had reported a history of severe substance abuse, that he stayed sober while in counseling (which he evidently discontinued several months before the murders), that he never expressed animosity toward his parents, that he expressed remorse for his crimes, and that he would not “have committed this crime had he not been severely impaired by intoxication.” J.A. 679-680. The district court concluded that McHone was not prejudiced by the absence of such testimony, reasoning as follows:
Delp’s testimony regarding petitioner’s participation in the counseling program is barely relevant. Delp shows that while petitioner could stay sober and do well for extended period of time, he did not do so prior to the murders. This is hardly a redeeming character trait. Delp’s opinion that petitioner would not have committed the murders unless intoxicated is simply his unsubstantiated *706 personal opinion and would not be admissible .... Delp’s testimony concerning petitioner’s self-serving statements in prison following the murder are of little help to petitioner. Similar testimony was presented, along with evidence that the statements were fabricated by petitioner to escape the death penalty. The jury did not believe petitioner’s other self-serving statements and one more would not have altered the situation.
Id. at 863-64. We agree with this reasoning and the district court’s conclusion that McHone was not prejudiced by Delp’s absence, particularly where, as here, the jury concluded that McHone had “previously sought help for his substance abuse problems,” id. at 580, 584, but nonetheless recommended the death penalty.
McHone was not prejudiced by counsel’s failure to present the testimony of his probation officer Larry Cheney. Cheney could have testified that McHone called on the day of the murders and successfully sought permission to stay out late, that McHone was a timid, humble individual, that he struggled with substance abuse, and that he did not complain about the terms of his probation. Id. at 571, 673. At trial, the defense succeeded in excluding evidence of McHone’s probationary status, id. at 245-49, and therefore Cheeky’s testimony, and thus any prejudice, would relate only to sentencing. But the jury found that McHone had a history of substance abuse and was drinking the night of the murders, id. at 579, 583, and McHone’s purported humility and his unsuccessful attempt to obey the conditions of his probation did not relate to any of the mitigating factors considered and rejected by the jury.
Nor can McHone find relief in counsels’ failure to garner expert testimony regarding his blood alcohol content. Dr. Warren, who testified for the defense, said, post-conviction, that if counsel had provided him with the testimony of Sawyers, Bryant, and McMillian, he could have calculated McHone’s blood alcohol content and testified that McHone was “incapable of forming specific intent to kill.” Id. at 677. But Dr. Warren did not need counsel’s help to calculate McHone’s blood alcohol content; rather, as explained by the district court, Dr. Warren could have used his interviews with McHone or Dr. Groce’s report, “where McHone set out the amounts of alcohol he consumed,” to perform this calculation. Id. at 848-49. Accordingly, any ineffectiveness is attributable to McHone’s expert rather than to his counsel and therefore cannot support a Strickland claim. See Thomas v. Taylor, 170 F.3d 466 (4th Cir.1999) (rejecting petitioner’s efforts to recast a claim concerning the effectiveness of an expert as a Strickland claim). And, even if counsel were to blame, petitioner was not prejudiced, because the jury unanimously rejected Warren’s sentencing testimony that McHone was entitled to the statutory miti-gator, N.C. GemStat. § 15A-2000(f)(6) (“the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired”), even though Tammy Sawyers, the state’s witness, had testified that McHone had consumed vast quantities of alcohol and even though the jury concluded that McHone committed both murders “under the influence of alcohol.” J.A. 579, 583. As the state court concluded, counsels’ failure to put forth additional evidence quantifying McHone’s drinking does not satisfy either Strickland prong. Id. at 743.
B.
McHone alleges further ineffectiveness in his counsels’ failure to object to a portion of the state’s closing argument pertaining to the burden of proof for McHone’s voluntary intoxication defense.
*707 In his closing argument, purporting to quote the law as interpreted by the North Carolina Supreme Court, the prosecutor stated:
One of the things I want to talk with you about is the defense of intoxication ... [i]f we’re going to apply that defense to the facts in this case then we really need to, ought to know what it’s about ... [i]n State v. Bunn> [the] North Carolina Supreme Court, in the spring term of 1973, said ‘the defense to charge of murder is that he was so drunk that he was utterly incapable of forming a deliberate and premeditated purpose to kill’ ... This is what the court said about that.
J.A. 442.
% :fc # * *
Voluntary drunkenness is not a legal excuse[.] ... Evidence must show at the time of the killing the defendant’s mind and reason were so completely intoxicated and overthrown as to render him ... utterly incapable of forming a deliberate and premeditated purpose to kill ... This is what the North Carolina Supreme Court has said about that defense.
Id. at 447-48. This statement is not correct. Rather than reciting the proper considerations for the jury vis-a-vis McHone’s voluntary intoxication defense, the prosecutor recited the standard the court must apply in order to determine whether the defendant is entitled to an instruction on voluntary intoxication. State v. Mash, 323 N.C. 339, 372 S.E.2d 532 (1988). And, indeed, in Mash, where the trial court included very similar language in its jury instructions, the North Carolina Supreme Court awarded the defendant a new trial because it concluded that “to find for the defendant on the intoxication issue, the jury does not have to conclude that his intoxication rendered him utterly incapable of forming the necessary intent; it need only conclude that because of his intoxication either defendant did not form the requisite intent or there is at least a reasonable doubt about it.” Id. at 537. Mash also noted that language similar to that used by the prosecutor in this case “could have led a rational jury to believe that defendant bore the burden of persuading the jury that he was so intoxicated as to be unable to form a deliberate and premeditated intent to kill.” Id.
We do not reach the question of whether counsel’s failure to object to the prosecutor’s statements was objectively unreasonable because we are satisfied that McHone cannot establish prejudice from the prosecutor’s closing statement. Unlike in Mash, here, the trial court properly instructed the jury on the defense of voluntary intoxication. Notwithstanding the prosecutor’s incorrect statement of the law in his closing statement, the trial court correctly instructed the jury as follows:
Now, members of the jury, as to the defense of voluntary intoxication, I instruct you that if you find there is evidence which tends to show that the defendant was intoxicated from alcohol or other impairing substance at the time of the acts alleged in this case then you should consider the following instructions: Generally voluntary intoxication from such a substance is not a legal excuse for crime. However, if you find that the defendant was intoxicated from alcohol or other impairing substance you should consider whether this condition affected his ability to formulate the specific intent which is required for a conviction of first degree murder; or for that matter, assault with a deadly weapon with intent to kill. In order for you to find the defendant guilty of first degree murder by premeditation and deliberation you must find beyond a reasonable doubt that he killed with malice, and in the execution of actual specific intent to kill formed after premeditation *708 and deliberation. If as a result of intoxication from alcohol or other impairing substance the defendant did not have a specific intent to kill the deceased in either of the three cases, or if you find he did not have the specific intent to kill in either of the two murder cases formed after premeditation and deliberation he would not be guilty of such offense.
Supp. J.A. 66-67 (emphasis added). Further, the court instructed that it was the jury’s “duty to apply to the facts the law which I am about to give you,” id. at 43, and that “I would expect only that you apply the law which I have given you to the facts as you find them.” Id. at 68.
It is fundamental in the law that “[a] jury is presumed ... to follow its instruction,” Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000). Here, not only did the trial court instruct the jury correctly as to the governing law; it instructed the jury both clearly and in detail. Indeed, not only did the district court correctly, clearly and in detail instruct the jury as to the governing law; additionally, the court instructed the jury that it was only to apply the law as to which the court had instructed, eliminating any doubt (if there were any) that statements by the prosecutor or defense as to the law were not to be considered. Moreover, the trial court’s clear, particularized, correct instruction followed almost immediately upon the prosecutor’s closing statement, only a brief recess separating the argument from the instruction.
In light of the controlling presumption that the Supreme Court has directed us to indulge, and the context of the prosecutor’s statement and the curative instruction described, we cannot possibly conclude that the North Carolina Supreme Court unreasonably applied federal law in concluding that McHone was not prejudiced by counsel’s failure to object to the prosecution’s misstatement. See J.A. 753-56 (“Defendant has failed to show the existence of either the prejudice or performance component of ... Strickland.”). In light of this presumption and context, we could not conclude that the state court erred, even were the state court’s judgment not subject to the deferential standards of AEDPA to which it undeniably is subject. See, e.g., United States v. Catlett, 97 F.3d 565, 573 (D.C.Cir.1996) (holding that accurate jury instructions on the state’s burden of proof “would have cured any confusion caused by the prosecutor’s remarks” suggesting incorrectly that the burden rested with the defendant); see also Boyd v. French, 147 F.3d 319, 329 (4th Cir.1998) (holding that a prosecutor’s repeated improper references to his personal opinions on the defendant’s credibility and the weight to be given various mitigating factors did not deny the defendant due process where “the state trial judge instructed the jurors that they were to decide the facts based on the evidence presented”).
C.
Relying on the affidavit of a social worker and Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), McHone claims that his counsel was ineffective for failing to investigate and present mitigating evidence of his chaotic and violent childhood. But unlike in Wiggins, where counsel made “a tactical judgment not to present mitigating evidence at sentencing,” id. at 2535, and the Court determined that “the investigation supporting counsel’s decision not to introduce mitigating evidence” was insufficient, id. at 2536, McHone’s counsel presented substantial evidence of the hardships McHone endured as a child and the jury found seven mitigators for each murder charge on the basis of this testimony. J.A. 579-80, 584-85.
*709 Accordingly, we analyze whether the scope of counsel’s investigation in support of the mitigation case presented at sentencing was objectively reasonable. Counsel presented its mitigation case through the testimony of McHone’s father and Dr. Warren. Counsel retained Dr. Warren, a forensic psychologist, to, inter alia, consider “sentencing factors” and “recommendations for sentencing or things of that nature.” Id. at 509-10. In support of his evaluation, Dr. Warren relied on McHone’s medical records, school records, psychiatric records, reports from Dr. Rollins and Dr. Groce, and several interviews with McHone. Id. at 510-512. Based upon the information included in these sources, Dr. Warren testified that McHone had “a very serious substance abuse problem since a very early age,” id. 513, “was exposed to ... alcohol abuse and alcoholism” by his “father at [an] early age,” id. at 514, and that after his mother’s marriage to Wesley, Sr., he was the “odd man out.” Id. at 515.
McHone’s father, Bobby, testified that early in McHone’s life, while Bobby was married to Mildred, Bobby was continually “drunk,” “did everything wrong,” and “gave Mildred no peace whatsoever,” and that McHone witnessed his parents arguing. Id. at 532-33. Bobby further testified that this state of affairs continued until, after an extremely violent fight with Mildred, he hospitalized himself and subsequently managed to quit drinking for five years, until the time of his separation from Mildred. McHone was ten years old at the time. Id. at 532-34. After Mildred and Bobby separated, they agreed that she would keep McHone one year and Bobby the next (and so forth), and Bobby testified that, during the time he kept McHone, he provided no supervision, he was drinking and gambling, he took McHone to bars with him where they sometimes spent the night, that McHone started drinking when he was 13, started doing drugs when he was 15, and that McHone’s alcohol and substance abuse worsened over time. Id. at 538-541.
Based on this testimony, the jury found the following mitigating factors for both murders: “the defendant had a history of long-term substance abuse,” “the defendant enjoyed a normal childhood until the time his parents separated, and after that, he began using alcohol and drugs,” “[d]e-fendant’s father abused alcohol and gambled excessively and defendant, when he was a child, often spent time with his father in bars while his father drank and gambled,” “[defendant often witnessed arguments between his father and mother,” “[defendant, while he resided with his father, was often left alone at night, without supervision, while his father worked third shift,” and “[defendant, while he resided with his father, often had to reside in undesirable places.” Id. at 579-80, 583-84.
Despite this comprehensive presentation of mitigating evidence supported by direct witness testimony and the thorough investigative efforts of Dr. Warren, McHone claims his counsel was ineffective because their investigation failed to uncover information contained in the post-conviction affidavit of Dr. Glenn E. Rohrer. J.A. 576. McHone claims that counsel would have uncovered the information in this affidavit if they had retained a mitigation expert or conducted a more thorough investigation.
This claim is meritless. Dr. Rohrer’s affidavit is almost entirely cumulative with the testimony that McHone’s counsel presented at trial. See, e.g., J.A. 576 (Rohrer averring that “Bobby McHone was drunk and abusive,” that “family problems and dysfunction permeated Steven’s social history,” that “he began medicating with drugs and alcohol when he was approximately 12 years old,” that “Bobby McHone exposed Steve to ... heavy drinking, marijuana use and gambling,” that “Steven was *710 the odd person out amongst his half-siblings,” and that “the custody arrangement ... was emotionally unstable”).
And, the portions of Dr. Rohrer’s affidavit that purportedly differ from the trial testimony, namely that McHone witnessed Bobby “regularly inflict brutal beatings on Mr. McHone’s mother and his sister,” id. at 575, and that Bobby “made repeated sexual advances towards Steven’s half-sister,” id. at 576, are not sufficient to establish either that counsels’ decision not to investigate further was objectively unreasonable or that McHone was prejudiced by that decision. Indeed, Bobby testified that he had violent fights with Mildred and that McHone, though young, witnessed these arguments. Moreover, Dr. Rohrer’s affidavit does not conflict with the time-line established during Bobby’s testimony, namely that the bulk of the drinking and violence during their marriage occurred before McHone was five years old and that, after McHone was five, Bobby stopped drinking and gambling. Finally, Dr. Rohrer has provided no indication that McHone was aware of his father’s sexual advances toward his half sister. Accordingly, we hold that where, as here, counsel has investigated and presented mitigating evidence pertaining to petitioner’s childhood and that the jury has credited such evidence and nonetheless imposed the death penalty, that counsel’s decision not to investigate further, particularly where such investigation would bear little — if any — fruit, cannot support a Strickland claim. The state court’s identical conclusion, J.A. 752-52, was therefore not objectively unreasonable.
IV.
Judge Gregory, in dissent, concludes the McHone is entitled to relief under Strickland because of counsel’s failure to investigate and present evidence of specific intent, because of counsel’s failure to object to the prosecutor’s improper closing argument, and because of counsel’s failure to adequately investigate mitigating evidence. But he provides little, if any, analysis as to why the North Carolina Supreme Court’s adjudication of these claims constituted an “objectively unreasonable” application of federal law. Indeed, Judge Gregory’s analysis on these scores comprises only conclusory statements that “[i]n light of the gravity of these errors and their prejudicial effect, AEDPA’s ‘unreasonable application’ standard does not alter” his conclusion that counsel acted unreasonably, post at 74-75, and that the state court’s determination that McHone was not prejudiced by counsels’ purported errors was objectively unreasonable “given the gravity of these errors and their prejudicial effect.” Post at 81. Such conclusory statements and cursory treatment are an insufficient basis to reverse a judgment entitled by statute to substantial deference by the federal courts.
Judge Gregory maintains that counsel erred by not procuring testimony regarding McHone’s blood alcohol content on the night of the murder. But he concedes, as he must, that circuit precedent dictates that McHone is not entitled to relief for ineffectiveness attributable to his expert, even if it could be said that McHone’s expert was ineffective, which he clearly was not. Post at 63. While Judge Gregory claims that this authority is inapplicable because “counsel failed to give [Dr. Warren] all the necessary information” to calculate petitioner’s blood alcohol content, post at 62, such a conclusion ignores the district court’s finding that “Dr. Warren testified” that he reviewed Dr. Groce’s report where Dr. Groce “set out the amounts of alcohol [McHone] consumed.” J.A. 848. Indeed, the dissent makes no attempt whatsoever to reconcile Dr. Warren’s trial testimony with his claim in his post-conviction affidavit that he “received no specific information regarding the *711 amount and types of alcohol ingested by McHone,” a claim that is belied by the contents of Dr. Groce’s report. Such merely serves to highlight that the state court’s conclusion that Dr. Warren’s failure to testify to McHone’s blood alcohol content was indeed an entirely reasonable application of Strickland.
In the same vein, Judge Gregory concludes that counsel performed unconstitutionally by failing to interview and present as witnesses Mark Tuttle and McHone’s jailors, Leroy Snow and Charles Collins. Judge Gregory suggests that Tuttle could have offered “key testimony on McHone’s state of mind,” post at 64, that “McHone was not threatening his parents that night,” post at 71, and could have testified as to McHone’s “impairment.” Post at 70. But Tuttle could not have testified to McHone’s impairment because he did not observe McHone on the night of the murders. Moreover, testimony that McHone was “upset and crying” is plainly cumulative with the testimony of virtually every witness that did observe McHone on the night of the murders and does not bear on whether McHone formed specific intent in any event. And any benefit McHone might have received from Tuttle’s testimony that McHone was “upset” and “asked him to come over there and see him,” J.A. 611, would obviously have been offset by McHone’s revelation to Tuttle that “somebody was gonna die that night” and Tuttle’s observation that McHone had been “backsliding” from his efforts to reduce his drug and alcohol dependency— testimony that no counsel would want placed before the jury. Id. at 610-11.
Judge Gregory also suggests that if Collins and Snow had testified that their testimony would have been “in direct contradiction to the testimony of the state’s law enforcement officers.” Post at 64. But such a conclusion mischaraeterizes the possible content of the jailor’s testimony; they could not directly contradict the testimony of the other witnesses because they did not observe McHone until two hours after the commission of the murders. Moreover, Judge Gregory’s conclusion is inconsistent with his determination that McHone’s Brady claim is meritless. While Judge Gregory writes separately to explain that Randy Adams’ statement, where he purportedly revealed that McHone was drunk and “the worse I’ve ever seen him,” post at 56, and Deputy Inman’s statement, that McHone had a strong odor of alcohol and was not steady on his feet, were favorable under Brady, he nonetheless concluded that the suppression of these statements was not material. Inman’s and Adams’ statements being, in material respects, indistinguishable from Snow’s and Collins’ statements, Judge Gregory’s conclusion that the absence of the former was not material under Brady while at the same time concluding that the absence of the latter was prejudicial under Strickland is analytically indefensible.
Similarly, Judge Gregory concludes that counsels’ failure to object to the prosecutors’ statements regarding McHone’s voluntary intoxication defense warrants relief under Strickland because the jury might have been “confused on the correct standard.” Post at 74. But Judge Gregory concedes that “the judge did give a proper jury instruction,” id. at 73. Thus, in order to reach the conclusion that he does, Judge Gregory must disregard the Supreme Court’s teaching that juries are presumed to follow such instructions, particularly where, as here, the trial court instructed the jury that “I would expect only that you apply the law which I have given you to the facts as you find them.” J.A. 68. In addition to his necessary disregard of Supreme Court precedent and the particular instructions given to McHone’s jury, Judge Gregory’s conclusion ignores the standard of review, set forth by Congress, that peti *712 tioners such as McHone are entitled to relief only where a state court’s application of federal law is objectively unreasonable. Here, the state court presumed, as the Supreme Court has instructed, that the jury followed the trial court’s instructions. This is precisely the presumption required of the state court by the Supreme Court of the United States. It is simply insupportable in the face of this indisputable adherence to the Court’s precedent by the state court and without any analysis or supporting authority whatever, to conclude that the state court unreasonably applied established federal law.
Judge Gregory’s conclusion that McHone’s counsel was ineffective for failing to present additional mitigating evidence relating to McHone’s childhood is similarly untenable. As noted above, unlike in Wiggins where counsel did not present any evidence of mitigation, here counsel submitted ample evidence of the hardships McHone endured during his childhood and the jury credited this evidence when it found the related mitigating factors. Judge Gregory’s description of counsels’ actions and the purported prejudice therefrom simply fails to confront this fundamental point. Judge Gregory suggests that a mitigation investigation “would have revealed” that “McHone has a history of chronic violence from birth through the divorce of his parents,” that “McHone’s childhood was marked by deprivation,” that “McHone’s parents agreed to an unconventional custody arrangement,” and that “McHone self-medicated with drugs and alcohol from age 12.” Post at 67-68. But McHone’s counsel presented this evidence to the. jury. Bobby McHone testified that early in McHone’s life that Bobby was continually drunk, “gave Mildred no peace whatsoever,” that McHone witnessed his parents arguing, and that Mildred and Bobby agreed to an unconventional custody arrangement. J.A. 532-34. Moreover, as described in detail above, both Dr. Warren and Bobby McHone testified that McHone used drugs and alcohol from an early age and suffered various forms of deprivation.
Despite counsels’ introduction of this substantial mitigating evidence, Judge Gregory maintains that counsels’ mitigation investigation was inadequate because the jury might have been confused by the mitigating factor that McHone “enjoyed a normal childhood until the time his parents separated, and after that, he began using alcohol and drugs.” But the phrasing of one mitigating factor does not bear on the propriety of the scope of counsels’ mitigation investigation. And, while Judge Gregory suggests that this mitigating factor could have caused the jury to conclude that McHone’s childhood difficulties did not begin until his parents’ divorce, he does not identify any evidence that rebuts Bobby McHone’s testimony that from the time he quit drinking — when McHone was five years old — until the time he separated from Mildred — when McHone was ten years old' — that there were “a few arguments” but that it “wasn’t like it was when I was drinking.” J.A. 534.
V.
For the reasons stated, the judgment of the district court is affirmed.

AFFIRMED

. While Judge Gregory, in dissent, claims that the inconsistencies in Wesley, Jr.’s pretrial and trial statements extends further, he merely states such as a conclusion, without any supporting analysis. He maintains that the inconsistencies extend to Wesley, Jr.’s pretrial statement that McHone was "obviously drunk” and to Wesley, Jr.'s trial statement that the only indication he had that McHone had been drinking was that Wesley, Sr. told him to go "sleep it off.” But Judge Gregory does not even reference, much less address, the context of these statements, as we have carefully set forth, which demonstrate that these statements are not, in fact, inconsistent. Additionally, without reference to any specific pretrial or trial testimony, Judge Gregory suggests that Wesley, Jr.'s testimony was inconsistent with respect to impairment. But this conclusion is belied by Wesley, Jr.'s unequivocal assessment of McHone's impairment in his pretrial statement.

. Contrary to McHone's contention, Monroe v. Angelone, 323 F.3d 286 (4th Cir.2003), does not aid his materiality claim. There, we found a Brady violation where the prosecution failed to disclose that the only witness that testified that the murder was premeditated had received numerous incentives from the state — including dismissal of certain gun charges and a reduced sentence for another offense — and had made inconsistent statements to investigators. Id. at 314. Moreover, the prosecutor told the jury that “it's absolutely true that the Commonwealth has not promised [the witness] anything.” Wesley, Jr. received nothing from the state, his statements and testimony on the determinative issue of impairment were consistent, and this testimony was corroborated by the testimony of Wendy Adams, Tammy Sawyers, and Deputy Inman.

. Wendy and Wesley, Jr. mentioned McHone "being drunk or drugged” not based on their personal observations but rather based on Randy Adams' description of a phone call he had with McHone earlier in the evening. J.A. 603.

. Petitioner and Judge Gregory’s characterization of McHone's first degree murder conviction as "marginal” or "weak” is fanciful. The jury was presented ample evidence from which it could conclude that McHone committed the murders with the requisite malice, premeditation, and deliberation. The jury heard evidence that on prior occasions McHone had chased his mother around the house with a knife, threatening to kill her, McHone, 435 S.E.2d at 301, that Mildred reported to her friends that she was afraid to be alone with him because "[h]e ha[d] told [her] that he [was] going to kill [her],” id., and that she was “afraid to lay down and go to sleep at night” because she believed that "sooner or later he [was] going to kill [her].” Id. The slate also proffered testimony that McHone loaded both murder weapons just prior to using them to kill his victims and that he was able to reload the shotgun after he killed Wesley, Sr. J.A. 461. And, of course, Wesley, Jr. testified that after he was subdued by Wesley, Sr., McHone acquired the shotgun, walked from the back room to the kitchen, and shot his step-father in the chest, killing him.

. In an effort to dilute the deference to which the state court is entitled under AEDPA, 28 U.S.C. § 2254(d), petitioner points to the "State court's one-line adjudication" of his Strickland claims. Petitioner's Br. at 16, 37. Under our circuit precedent, such an adjudication does not defeat the deference to which the state court's judgment is entitled. See Bell, 236 F.3d at 158 (summary adjudications subject to full AEDPA deference). Moreover, while petitioner’s characterization of the North Carolina Supreme Court's treatment of this matter is accurate, it ignores the extensive treatment that some of petitioner's Strickland claims received in the Superior Court. J.A. 731-774. While the North Carolina Supreme Court reversed and remanded the Superior Court order containing these rulings, id. at 780, it did so only so that the Superior Court could determine "whether defendant or defendant’s counsel was served with a copy of the original proposed order" and for reconsideration of a discovery motion. Id. We conclude that the North Carolina Supreme Court's subsequent denial of McHone's petition for post-conviction relief on all claims otherwise left intact the reasoning of the Superior Court, id. at 815, and that the state is accordingly entitled to the benefit of the more thorough treatment of petitioner's Strickland claims in that court. See Bell, 236 F.3d at 159 ("a detailed state court order is more likely to withstand federal judicial scrutiny.”).